Schweitzer *v.* Bonn.

---

LENA SCHWEITZER et al.

*v.*

HILLARIC J. BONN and another, executors of John H. Bonn, deceased.

1. The decree of the orphans court allowing the account of an administrator on an alleged sale of assets at a certain price is not conclusive as to the value of such assets where the account was false, no sale having in fact been made.

2. Where an administrator reports the sale of assets at a certain price, when there was no sale in fact, equity will avoid the decree of the orphans court allowing the account, and require an accounting of the value of the assets, regardless of the value stated in such report.

3. Where it appears that the president of a corporation, holding over six thousand shares of the corporate stock in his own name and five hundred shares as administrator of a decedent's estate, reported to the orphans court a sale of his decedent's stock at one hundred and sixteen, when no sale had in fact been made, and that he actually sold five hundred shares, seven months after such report, to his brother-in-law at one hundred and sixteen, while the shares were worth nearly two hundred, the sale of five hundred shares should be considered as from his own holding, and decedent's shares should be accounted for at their true value.

Heard on bill, answer and proofs.

*Mr. Robert O. Babbitt* and *Mr. Gilbert Collins,* for the complainants.

*Messrs. Besson & Besson,* for the defendants.

PITNEY, V. C.

The complainants (two of whom are infants, and all of whom are residents of France) are the next of kin and beneficiaries under the will of Emile Schweitzer, deceased, late a resident of France. The defendants are the executors of John H. Bonn, late of the county of Hudson, deceased.

Mr. Bonn, on the 10th of February, 1890, took out from the orphans court of the county of Hudson letters of administration with the will annexed of Schweitzer, and administered upon certain personal property belonging to said Schweitzer situate in the county of Hudson. The main object of this suit is to recover from the executors of Bonn the estate of which he so possessed himself.

The estate of Schweitzer, according to the inventory filed by Mr. Bonn on the 16th of April, 1890, consisted of cash, $1,000; five hundred shares of the capital stock of the North Hudson County railway (of which Bonn was president), par value $12,500, appraised at $13,000; two mortgage bonds of the same railway, par value $2,000, valued at $2,250, and one land-purchase bond of the Flower Hill Cemetery Company, par value $1,000, valued at $900, making a total valuation of $17,250. These securities, as well as the cash, were in Mr. Bonn's custody as Schweitzer's agent at the latter's death.

Early in January, 1891, Mr. Bonn filed his final account, in which he charged himself with the amount of the inventory, $17,250; with the dividend of July 1st, 1890, upon the Hudson County railway stock, at four per cent., for six months, $500; one year's interest to January 1st, 1891, on the two bonds of that company, $120; one year's interest to January 1st, 1891, on the Flower Hill cemetery bond, $60; and the net proceeds

·of the sale of the five hundred shares of the capital stock of the North Hudson County railway, $1,500 above the inventoried price; and the net proceeds of the sale of the Flower Hill cemetery bond, $100 above the inventoried price; total, $19,530. After taking out the cost of settling the estate, there remained a balance in his hands of $18,360.55.

It thus appears that he charged himself in his account with having sold the five hundred shares of the North Hudson County railway stock at the inventory price of $13,000 and $1,500 in addition—in all, $14,500—being at the rate of sixteen per cent. above par value. That account was allowed by the court on the 31st of January, 1891, and the administrator charged with the balance shown of $18,360.55.

The allegation of the bill is that the securities stated in the account as having been sold were not sold but were retained by the administrator, Mr. Bonn, and that they were of much greater value than the amount with which the accountant was charged in said account.

The answer of the executors of Bonn denies the allegation that the securities had not been sold prior to the filing of the account, but alleges that he had, prior to the filing of his account, sold all the securities belonging to the estate for the best price that could then be obtained, and that he had actually sold ·the five hundred shares of North Hudson County railway stock at sixteen per cent. above par value; and. the executors deny that any of the assets of the estate of Schweitzer came. into their hands, but admit that the cash balance shown by· the account was in their hands and was ready to be paid over.

Mr. Bonn died on the 15th of November; 1891.

It appeared at the hearing that in point of fact, in the month of August, 1891, some eight months after the allowance of his account by the orphans court, the five hundred shares of railway stock standing in Schweitzer's name on the books were transferred by Mr. Bonn to one Jan Smith, of Holland, a relative of Bonn, to whom he was largely indebted, and that Smith did not pay him any cash for the same, but credited Mr. Bonn with the amount, $14,500, upon his (Bonn's) debt to Smith; and Mr.

Bonn did not, as an individual, pay to himself, as administrator of Schweitzer, the price of the shares at one hundred and sixteen or at any other rate, nor did he open any account in any bank as administrator of Schweitzer, or otherwise ear-mark or set aside any money as money of that estate.

No actual formal transfer of the railway shares standing in Mr. Schweitzer's name appears on the books of the company. All that does appear is that in the month of August, 1891, the old certificate issued to Mr. Schweitzer was surrendered and a new certificate issued in its place to Mr. Smith. On the stub of the new certificate is a memorandum in Mr. Bonn's handwriting, as follows: "Sold, January 5, 1891." Palpably, this memorandum was made not earlier than the date of the certificate—August 8th, 1891—and timely objection having been made by the complainants, I feel constrained to disregard it. In this connection it is to be observed that a dividend of four per cent. was declared on this stock on January 1st, 1891, which should have been credited to the estate if the stock was not sold until January 5th. The only other proof of the sale and of its terms, as distinguished from the mere transfer of the stock, was a letter from Mr. Smith to Mr. Bonn, dated in August 1891, accepting his offer to sell the stock at one hundred and sixteen, the proceeds to be applied on Bonn's indebtedness to him. The letter or letters from Bonn to Smith upon the same subject were not produced. This letter seems to fix the date of the sale in August, 1891.

It further appears that Mr. Bonn's estate was inventoried on the 14th of December, 1891, by his executors and two appraisers, at $560,000, of which $300,250 consisted of stock in the North Hudson County railway; that is to say, six thousand and five shares, of a par value of $25 a share, making $150,125, at par value, appraised at $50 a share, or at two hundred, making $300,250.

It further appears in the case that these six thousand and five shares were shortly afterwards sold for cash, at about the rate above mentioned.

It abundantly appeared, in the course of several motions

made in the cause, and was frankly admitted at the hearing, that if the railway stock had not been sold at the price obtained for it, Mr. Bonn's estate would have been insolvent.   This was due to the fact that a considerable portion of the assets other than the railway stock proved to be not worth its appraised value, and his debts were considerable.   The effect of this situation was that if one hundred and sixteen was the fair value of Mr. Bonn's six thousand and five shares at the time that the transfer of the five hundred shares of Schweitzer stock was made to Mr. Jan Smith, he, Bonn, was at that moment hopelessly insolvent; and as he did not pay, as an individual, to himself as administrator of Schweitzer, or set aside or otherwise ear-mark the purchase-money price—$14,500—for which he received credit from Jan Smith, he, in effect, took the money of the complainant to pay his private debt at a moment when he was insolvent.

Some time after the transfer to Smith, and shortly before Mr. Bonn's death, the then counsel for complainants called upon him to ascertain the condition of the Schweitzer estate and to devise means by which Mr. Bonn might safely transmit and pay to the complainants the fund in his hands.  In that interview Mr. Bonn did not mention the sale to Smith, but spoke of the securities of the estate as still in his hands unconverted, and asked why he could not transmit the stock *in specie* to Europe instead of the actual money.

Counsel having no notice of the actual transfer to Mr. Smith, or of the sale of the other securities, prepared his bill in its present shape, on the supposition that the securities still existed *in specie* in the hands of the executors.

The question to be decided is whether complainants are confined in their recovery to the amount fixed and allowed by the decree of the orphans court, or are entitled to surcharge that account with a sum equal to the difference between one hundred and sixteen, the price by the account fixed upon the railway stock, and two hundred, the price afterwards obtained by the defendants for similar stock held by their testator.

The defendants' counsel took the preliminary objection that

this court cannot, in this cause, go behind the decree of the orphans court, and contended that such decree is conclusive.

The bill attacks the decree of the orphans court directly. It charges, in effect, that the statement in the account, as allowed, to the effect that the securities in question had been sold at the prices named, was untrue, and that they were still in existence in defendants' hands, and were worth much more than the sum they were stated in the account to have produced. This was, in effect, charging fraud in the account, for I conceive it to be a fraud for an accountant to report that he has sold an asset at a certain price, when he has not sold it.

If, then, we have here the element of fraud, the jurisdiction of this court is established without resort to the other familiar ground, viz., that of mistake. *Boulton* v. *Scott, 2 Gr. Ch. 231; Burtis* v. *Hopkins,* cited in *Boulton* v. *Scott, 2 Gr. Ch. 238; Van Meeter* v. *Jones, 2 Gr. Ch. 520* (at *p. 523); Herbert* v. *Herbert, 2 Dick. Ch. Rep. 13,* and *4 Dick. Ch. Rep. 565,* to which may be added *Beatty* v. *Trustee, 14 Stew. Eq. 563,* in which case the element of mistake alone seems to have been sufficient to sustain the jurisdiction of this court to go behind the decree of the orphans court.

. It is true that, at the hearing, the facts proved did not fully sustain the allegation of the bill, since, as already stated, it appeared that there had been an actual formal sale and delivery of the assets several months after the account was allowed at the price therein stated, and so the precise question litigated was whether that sale and transfer can, under the circumstances, avail the defendants as an answer to the charges of the bill.

No objection was made that this question was not within the issues raised by the pleadings, for the reason, presumably, that the objection could have been met by an amendment.

Complainants attack this sale on two grounds—*first,* that it was not made in the ordinary course of business, or in such manner as to insure the production of the highest market value; *second,* that it was made to a near relative of the trustee in payment, *pro tanto,* of the trustee's indebtedness, and was not accompanied by any payment of the price to the trustee as such, and

setting aside of the proceeds among the assets of the estate, and was therefore a palpable and gross breach of trust, of which the trustee can have no advantage whatever. And upon this part of the case counsel for complainants makes the ingenious and charitable suggestion that Mr. Bonn—who was a gentleman of high standing—never intended to treat the transfer of the stock to his brother-in-law as an actual sale and disposition of the Schweitzer assets, but always intended to account for the five hundred shares (there is no dispute as to the value or disposition of the other assets) as if they still existed *in specie* in his hands, he being the owner of a large block of the same stock standing in his name.

This, so counsel suggests, is manifest from his interview with the then counsel of complainants a few days before he died.

I am inclined to think that this is the true explanation of his conduct. It will certainly be less reproach to his memory to accept it and to hold his statement to that effect as true and binding than to hold to the bare facts.

But to return to the actual points taken.

First, as to the irregularity of the sale. It was clearly the duty of the trustee to procure the best price he could, honestly, for these shares. It is admitted, and is a part of the defendants' case, that the stock was closely held; that there were very few sales, none at auction and none of any kind about the time of the allowance of the trustee's account, so that it had no known market value. He, as president of the company, had the means of knowing of actual sales and prices, and, above all, of knowing who would be likely to buy, and at what place and under what circumstances the best price was likely to be obtained. Under these circumstances it seems to me that his clear duty was to sell at auction, upon full general advertisement and such special notices to individual investors as he supposed would be likely to purchase. This was not done.

The company owned and operated an extensive network of surface street railroads in Hoboken and Jersey City, and had recently erected an expensive elevated cable road from the Hoboken ferry to the Heights, and, as I understand, branches

from thence were then in the course of construction.   The company had been paying dividends. at eight per cent. per annum, and, according to its books, had, besides, laid up each year a comfortable surplus.   Its prospects were good, and with its present actual earnings its stock must have attracted purchasers in the neighborhood.

· A sale of such stock, privately negotiated with a relative living in a foreign country, answers none of the requisites of a proper sale. by a trustee.   To sanction such a sale by adopting the price so obtained as the market value of the thing sold would be to allow a highly dangerous latitude to trustees in the disposition of the trust property.

It is argued that Mr. Bonn knew the intrinsic value of this stock, and knew it was worth no more than one hundred and sixteen.   It is probable that Mr. Bonn knew as much about its actual cost and immediate prospects as any other person, but, after all, its value depended upon so many elements other than its actual cost, such as earning capacity and prospects of business and the like, that it became a matter rather of speculative judgment than of actual cost.   Besides, the value of the franchise must be added to the actual cost.   It seems that within six months after the transfer to Smith a syndicate of intelligent capitalists were willing to pay two hundred for it.   They bought a portion of Mr. Bonn's holdings at that price.   Then on or about the 1st of July, 1892, they proceeded to declare a stock dividend of forty per cent. upon all the stock, and then paid one hundred and forty for the balance of the Bonn stock, including the shares given as a dividend, making the lowest price paid one hundred and ninety-six for the original shares.

But the vicious effect of this irregular mode of sale is felt with its full force when to it is added the fact that nothing was in fact paid for the stock.   The trustee received no money for it, but applied it to the payment of his own debt to Smith, without, at the same time or at any other time, setting aside out of his private funds the price thereof and ear-marking it as the money of the estate.

It is said that Mr. Bonn acted in good faith and obtained a

price which it is to be presumed he believed to be adequate.  If
that were so, then it is asked, and properly asked, on the part
of the complainants, why did he not take an equal number of
shares of his own stock and transfer them to his brother-in-law
in payment, *pro tanto*, of his own debt?   And to this question,
in my judgment, no satisfactory answer can be given unless it
be that suggested by the complainants' counsel, namely, that he
intended to treat, and did treat, the transaction as, in equity, a
transfer of his own shares and held an equal number of his own
shares for the benefit of the estate.   Any other view leaves him
guilty not only of a technical breach of trust, but one liable,
and in this case likely, to produce disastrous consequences.   Of
such conduct on the part of a trustee, this court can have no
words except those of condemnatien, and cannot permit him to
derive any benefit from it.

In my judgment, the case must be treated precisely as though
the shares in questiou had not been transferred to Smith, but
had been retained *in specie* by Mr. Bonn, as a part of his own
holdings.

I will advise a decree that the defendants account for all divi-
dends received on these shares after the one already accounted
for, and for their value at the average price which they received
for the whole of their holdings, with interest from the date of
sale.   They must also account for interest on the balance found
in the hands of the executors, viz., $18,360.35, less $14,500, the
portion thereof due to the railroad shares, which, being deducted,
leaves $3,860.35 to bear interest.

The question arising upon the face of the will of Schweitzer
is reserved.